UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| CV BORROWER II, LLC<br>1701 Rockville Pike Suite B20<br>Rockville, MD 20852-1653 | * <br><br>* | |
| And | * | Case No.: |
| CONGRESSIONAL VILLAGE<br>   ASSOCIATES, LLC<br>1701 Rockville Pike Suite B20<br>Rockville, MD 20852-1653 | *<br><br>*<br><br>* | |
|       Plaintiffs | * | |
| vs. | * <br><br>* | |
| SITUS HOLDINGS, LLC<br>5065 Westheimer Road<br>Suite 700E<br>Houston, TX 77056 | *<br><br>* | |
| SERVE ON:<br>   Resident Agent: THE CORPORATION<br>   TRUST COMPANY<br>   CORPORATION TRUST CENTER<br>   1209 Orange Street<br>   Wilmington, DE 19801 | *<br><br>*<br><br>*<br><br>* | |
| BERKADIA COMMERCIAL<br>MORTGAGE, LLC<br>521 Fifth Avenue<br>20th Floor<br>New York, NY 10175 | *<br><br>*<br><br>* | |
| SERVE ON:<br>   Resident Agent: THE CORPORATION<br>   TRUST INCORPORATED<br>   351 West Camden Street<br>   Baltimore, MD 21201 | *<br><br>*<br><br>*<br><br>* | |
| KEYBANK NATIONAL ASSOCIATION<br>AS MASTER SERVICER, IN TRUST<br>FOR WELLS FARGO, NA, AS TRUSTEE<br>FOR THE REGISTERED HOLDERS<br>OF COMM 2007-C9 COMMERCIAL<br>MORTGAGE PAST DUE CERTIFICATES<br>Key Tower<br>127 Public Square<br>Cleveland, OH 44144 | *<br><br>*<br><br>*<br><br>* | |

**WELLS FARGO, N.A., AS TRUSTEE**
**FOR THE REGISTERED HOLDERS**                    *
**OF COMM 2007-C9 COMMERCIAL**
**MORTGAGE PAST DUE CERTIFICATES**                *
**101 N. Phillips Avenue**
**Sioux Falls, SD  57104**                        *

**SERVE ON:**                                     *
      **Resident Agent: CSC-LAWYERS**
      **INCORPORATED SERVICE CO.**                *
**7 St. Paul Street, Suite 820**
**Baltimore, MD 21202**                           *

      **Defendants**                         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT
## AND BREACH OF CONTRACT

Plaintiffs, CV Borrower II, LLC ("**Borrower**") and Congressional Village Associates,

LLC ("**Congressional LLC**"), bring this action seeking a declaratory judgment and damages for

a breach of contract concerning the improper and baseless declaration of a default by the

Defendants with respect to two (2) mortgage loans. (Borrower and Congressional LLC are

hereinafter collectively referenced as "**Plaintiffs**.")

## NATURE OF THE ACTION

1.     In 2007, Borrower obtained two (2) cross-collateralized loans for a total of $68

million (the "**Loans**").  The proceeds of the Loans were used to refinance mortgages for (1) real

property improved by a shopping center known as The Shops at Congressional Village ("**The**

**Shops**"), and a post office (the "**Post Office**"), with respective addresses of 1701 Rockville Pike

and 143 Rollins Avenue, Rockville, Maryland 20852; and (2) land located at 198 Halpine Road,

Rockville, Maryland 20852, which is subject to a ground lease and was developed by the tenant

into an apartment complex (the "**Apartment Parcel**").  (Hereinafter, property improved by The

Shops and the Post Office, and the Apartment Parcel are collectively referenced as the

"**Property**.")

2

2.     Borrower is a wholly owned subsidiary of Congressional LLC, which owns the Property and granted deeds of trust and guaranties to secure the Loans.

3.     On September 15 2015, defendant Berkadia Commercial Mortgage, LLC ("**Berkadia**"), acting as the servicer of the Loans, notified Borrower that the Loans were in default ("**Notice of Default**").  The only stated "Event of Default" was the contention that the Property or a portion thereof had been taken by execution or other process of law, which purportedly constituted a default under Section 12.1(h) of the Indemnity Deed of Trust ("**IDOT**").  The Notice of Default reserved the rights of Berkadia and the lender to exercise any and all legal remedies available without further notice or demand to Plaintiffs.  (The Notice of Default is attached hereto as **Exhibit 1**.)

4.     Immediately upon receiving the Notice of Default, Plaintiffs explained to Berkadia, and a few days later provided documentation to prove, that there had not been a default.  Neither the Property nor any part of it had been taken, by execution or other process of law, or otherwise.  (Plaintiffs' letter to Berkadia is attached hereto as **Exhibit 2**.)

5.     Rather than concede its mistake, Berkadia ignored the information provided by Plaintiffs and exacerbated the situation by referring the Loan to a "Special Servicer," defendant Situs Holdings, LLC ("**Situs**").  The compensation of special servicers typically includes a servicing fee and a significant percentage of whatever default interest they are able to collect.

6.     The mere referral of a loan to a special servicer damages the reputation of a borrower and its affiliates, and typically results in an increase in the interest rates on mortgage loans which the borrower and/or its affiliates may procure in the future.

7.     The purported Event of Default was a sheriff's sale connected to litigation in which Plaintiffs were <u>not</u> parties.  The case was in the Circuit Court for Montgomery County and

styled as Tower Oaks Boulevard, LLC, et al. ("**Tower Oaks**") v. Ronald Cohen Investments, Inc. ("**RCI**") and Ronald Cohen Management Company ("**RCM**"), Case No. 368256V (the "**Tower Oaks Lawsuit**").   Tower Oaks was the landlord of RCI and RCM ("**Tenants**"), and the suit concerned unpaid rent and the Tenants' requests for accommodations in the wake of the Great Recession.

8.      In May 2014, a judgment was entered in favor of Tower Oaks and against RCM and RCI for unpaid rent, and for compensatory and punitive damages for tortious interference with contract, and attorneys' fees.  In early June 2014, Tower Oaks instructed the clerk of the court to issue writs of execution against the Property even though (i) as noted previously, neither the Borrower nor Congressional LLC was a defendant in the Tower Oaks Lawsuit, and (ii) the Tenants did not then have, and never have had, an interest in the Property.

9.      In July 2014, the Sheriff served the writs of execution and attached whatever interest RCM may have had in the Property.  (The Writs of Execution are attached hereto as **Exhibit 3**.)  Congressional LLC – as the owner of the Property – moved to release the writs of execution, but the motion was denied based upon a vague alter ego theory that had not been raised in the trial (in which Congressional LLC was not a party in any event), and despite the undisputed facts that (i) Congressional LLC had owned The Shops and the Apartment Parcel for more than thirty (30) years, and had owned the Post Office parcel for more than twenty-six (26) years; (ii) RCM had never even been a direct or indirect owner of Congressional LLC; and (iii) RCM's only connection to the Property had been as the property manager, and that non-ownership relationship had been terminated years earlier.

10.      On May 21, 2015, the circuit court entered an order allowing RCM to make a cash deposit of $12 million with the clerk of the court as a bond pending appeal ("**Cash**

Collateral Order"). The Order expressly stated that upon the posting of the cash deposit, the writs of execution and corresponding levies "are HEREBY RELEASED." (The Cash Collateral Order is attached hereto as **Exhibit 4**.)

11.     The Sheriff conducted a sale of whatever interest RCM might have in the Property on May 28, 2015, which in fact was none. Not surprisingly under the circumstances, Tower Oaks presented the winning bid by offering a "bid in judgment" of $1 million.

12.     On June 17, 2015, the $12 million cash deposit was placed with the clerk of the court (the "**Cash Deposit**"), and the writs of execution and attachments were automatically released per the terms of the Cash Collateral Order. (The Receipt for the $12 million Cash Deposit is attached here as **Exhibit 5**.)

13.     The Sheriff's "Report of Sale" was filed on June 25, 2015, but the sale was never ratified because the cash bond had nullified the writs on which it was predicated.

14.     RCM's appeal in the Tower Oaks Lawsuit was largely successful. On November 12, 2015, the Maryland Court of Special Appeals ("**CSA**") reversed the judgments for tortious interference and punitive damages. The CSA also reversed the denial of Congressional LLC's motion to quash the writs of execution against RCM's non-interest in the Property. (The Opinion of the Court of Special Appeals is attached hereto as **Exhibit 6**, and the reversal of the motion to quash is at 24-25.)

15.     Berkadia's Notice of Default had been sent approximately three (3) months after the writs of execution were released. Worse yet, after the CSA's opinion reversing the circuit court's decision to deny the motion to release the writs of execution, counsel for Situs sent Plaintiffs a letter, dated November 18, 2015, claiming that the Loan remained in default because the Sheriff's sale – which had never been ratified and which had been effectively annulled by

both the posting of the Cash Deposit and the CSA's opinion – was a transfer of a "direct or indirect interest" in the Property in violation of Section 5.3(a) of the IDOTs. Situs offered no further explanation for the Defendants' position, and did not address the undisputed facts that Congressional LLC had <u>not</u> been a party to the Tower Oaks Lawsuit; that RCM never had an ownership interest in the Property; that the writs of execution had been released in June 2015 pursuant to the court order allowing the cash bond to be posted; and that the CSA had held that the circuit court should have granted the motion to release the writs. (A copy of the letter from Situs' counsel is attached hereto as **Exhibit 7**.)

16.    The Notice of Default issued by Berkadia claimed that there was a default under Section 12.1(h) of the IDOTs, while Situs later claimed that an Event of Default occurred under Section 5.3(a) of the IDOTs. Apart from the validity of changing the alleged basis for a Notice of Default, the undisputed facts establish that there was no Event of Default under either section. (A copy of the IDOT for The Shops and the Post Office is attached hereto as **Exhibit 8**.)

a.    For an Event of Default to occur under Section 12.1(h) of the IDOTs, the Property or some portion thereof had to be "taken on execution or other process of law <u>in an action against</u> [Congressional LLC]" (emphasis added). It is clear that no action was brought against Congressional LLC, and that neither the Property nor any interest in it was taken, because (i) RCM had no interest in the Property and, (ii) in any event, the Sheriff's sale was never ratified. In addition, the CSA's Opinion established that the writs of execution had been improperly served upon the Property; therefore, as a matter of law, no transfer of any interest in the Property or any part thereof could have taken place.

b.    For an Event of Default to occur under Section 5.3 of the IDOTs, there has to be a sale or encumbrance "of the Property or any direct or indirect interest, therein."

However, up to forty-nine percent (49%) of the member interests in Congressional LLC may be transferred without the Lender's consent. Thus, an Event of Default also did not occur pursuant to Section 5.3 of the IDOTs because there was no transfer of the Property or any interest in Congressional LLC. Further, even if there had been a levy upon RCM's non-interest in Congressional LLC, and even if a sale of that non-interest occurred, Section 5.3 would not have been violated because there is no legal or factual basis to contend that a sale of RCM's non-interest in the Property would have resulted in a transfer of more than forty-nine percent (49%) of the membership interests in Congressional LLC.

17.    Situs, Berkadia and defendant KeyBank National Association ("**KeyBank**"), as the Master Servicer in Trust for Wells Fargo, N.A. ("**Wells Fargo**"), and Wells Fargo as Trustee for the Registered Holders of Comm-2007-C9 Commercial Mortgage Past Due Certificates (collectively, "**Lender**"), continue to maintain that Plaintiffs are in default, and are liable for default interest and penalties, amongst other fees and actions that could be taken as a result of the alleged default.

18.    Plaintiffs are in urgent need of a declaratory judgment that they have never been in default under the Loans, and that the declaration of default was invalid at all times. Interest rates remain at historically low levels and Plaintiffs are seeking to refinance the Loans and release or "defease" the Property from the lien, operation and effect of the IDOTs, as expressly permitted by the IDOTs. However, Borrower and Congressional LLC are prevented from refinancing the Loans, except possibly at great cost and hardship, because, among other things (i) the Lender is insisting on payment of default interest, attorneys' fees and other charges that would impose a substantial economic burden upon Congressional LLC, (ii) "defeasance" of the Loans is not allowed if the Lender is claiming that an Event of Default exists, and (iii)

prepayment of the Loans when the lender is asserting an Event of Default requires payment of a "Premium" in accordance with the "Prepayment Premium Rider" to the Promissory Notes, in the amount of five percent (5%) of the unpaid principal balance, which would be approximately $3.3 million as of February 29, 2016.

19.    If Plaintiffs are compelled by the declaration of default to wait to refinance the Property when the Loans mature in 2017, the Plaintiffs may suffer further significant damages by having to pay higher interest rates and fees due to changing market conditions, and Plaintiffs will also likely suffer significant damages because an Event of Default was declared and servicing of the Loans was transferred to a special servicer.

20.    Plaintiffs also assert a claim for breach of contract and damages caused by the improper declaration of an Event of Default and the transfer of the servicing to a "special servicer."   Plaintiffs are damaged every day they are unable to begin the process of defeasing the Loans without being burdened by an alleged default and the involvement of a special servicer because the interest rate on the Loans is far higher than current market rates.  The full amount of the damages will be determined when the rates and terms to defease or refinance the Loans are established.

## PARTIES

21.    Borrower is a limited liability company organized and existing under and by virtue of the laws of Maryland, having its principal place of business at 1701 Rockville Pike, Suite B20, Rockville, Maryland  20852.

22.    Congressional LLC is a limited liability company organized and existing under and by virtue of the laws of Maryland, having its principal place of business at 1701 Rockville Pike, Suite B20, Rockville, Maryland  20852.

23.     Upon information and belief, Situs is a limited liability company organized and existing under and by virtue of the laws of Delaware, having its principal place of business at 5065 Westheimer Road, Suite 700E, Houston, TX 77056.

24.     Upon information and belief, Berkadia is a limited liability company organized and existing under and by virtue of the laws of Delaware, having its principal place of business at 521 Fifth Avenue, 20th Floor, New York, NY 10175.

25.     Upon information and belief, KeyBank is a national banking association with its principal address at Key Tower, 127 Public Square, Cleveland, OH 44114.

26.     Upon information and belief, Wells Fargo is a national banking association with its principal address at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction under 28 U.S.C. §1332 and 28 U.S.C. §2201, because there is diversity of citizenship between the parties, the Plaintiffs are requesting a declaratory judgment, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

28.     Venue is proper under 28 U.S.C. §1391 because the events giving rise to the claims occurred, and all of the Property that is the subject of the action is situated in this District. In addition, the Parties agreed in Section 13.7 of the IDOTs that suit could be brought in any Federal court in the district where the Property is located.

## FACTUAL BACKGROUND

### *The Tower Oaks Lawsuit*

29.     As of 2012, the Tenants were delinquent on certain rent payments and were seeking to modify the terms of their lease with Tower Oaks, but the parties could not reach an agreement.

30.    Tower Oaks filed suit on September 10, 2012. The complaint stemmed primarily from the Tenants' failure to pay rent, but it also asserted claims against the Tenants for tortious interference with contractual relations and other torts.

31.    Following a jury trial, on January 27, 2014, Tower Oaks was awarded $1.6 million on the breach of contract claim for unpaid rent and resulting damages; $2.3 million in compensatory damages for the Tenants' interference with the contractual relations between Tower Oaks and its lender; and unspecified punitive damages for that same tortious interference. The amount of punitive damages and the issue of attorney's fees were decided later by the trial judge, who ordered each Tenant to pay $1.5 million in punitive damages, and awarded Tower Oaks $690,000 for attorney's fees and expenses. The final judgment was filed on May 23, 2014, and the Tenants noted a timely appeal.

32.    In May 2014, but before the final judgment was enrolled, Tower Oaks obtained *ex parte* from the circuit court writs of attachment before judgment to be served on four (4) parcels of real property owned by entities other than the Tenants, including the parcels that comprise the Property. Tower Oaks, however, chose not to have the writs served, apparently because the court required a $100,000.00 bond to be posted with respect to each writ.

33.    After the judgment was enrolled, on June 3, 2014, Tower Oaks requested the clerk of the court to issue writs of execution to levy upon RCM's interest (there was none) in the same four (4) properties.

34.    As of the date Tower Oaks sought writs of execution, Congressional LLC had owned the Property for approximately three (3) decades. RCM had never held any ownership interest in the Property. RCM also had never held an interest in Congressional LLC. RCM's

only connection to the Property was that it had been the manager of the Property for a number of years, until that relationship was terminated as of November 1, 2011.

35.     On June 12, 2014, Congressional LLC, the Tenants and the owners of the other two parcels were unaware of the writs of execution requested in June, but they jointly filed a motion to release and/or quash the writs of execution issued by the court in May, which unbeknownst to them had been abandoned due to the bond requirements.  On July 2, 2014, the circuit court denied the motion without a hearing, simply noting in the order that the motion was moot, presumably because the writs issued in May were not being pursued.

36.     On July 8, 2014, the Sheriff served the writs of execution that Tower Oaks had obtained from the clerk of the court in June, after the final judgment was entered.  As stated in the writs, the Sheriff seized and took "into execution all of the right, title, claim, interest and estate both at law and equity of [RCM]" in the Property.  In describing the Property, the Sheriff's attachment reinforced the point that only RCM's interest was being levied upon by noting in the description of the property being levied upon: "Defendant['s] interest only." (*See* Exhibit 3.)

37.     On July 16, 2014, Congressional LLC and the other property owners moved to release the writs of execution from their respective properties.  Ultimately, the circuit court denied the motion based on an alter ego theory argued by Tower Oaks, even though no such theory was presented at the trial and Congressional LLC and the other property owners had not even been parties in the Tower Oaks Lawsuit.  Congressional LLC and the other property owners filed an appeal from the denial of the motion to release the writs of execution, which was later consolidated with the Tenants' appeal of the judgment entered in the Tower Oaks Lawsuit.

38.     Eventually, on May 7, 2015, the Sheriff advertised the sale of RCM's interest in the Property.  The advertisements were very clear that the sale was limited only to RCM's

11

interest in the Property by describing the writs of execution as resulting in the seizure of "the right and title, claim, interest, and estate of [RCM]," and by warning that "Purchaser should be aware that they are purchasing [RCM's] interest only," and "the Title Property Owner" disputes the contention that RCM has an interest in the Property and is challenging the writs of execution on appeal.  (The advertisements are attached hereto as **Exhibit 9**.)

39.    On May 12, 2015, the circuit court issued the Cash Collateral Order, which expressly provided that upon the posting of the cash deposit, the writs of execution and corresponding levies against the Property "are HEREBY RELEASED."  (*See* Exhibit 4 at 2.)

40.    On June 17, 2015, the Cash Deposit was posted in the Tower Oaks Lawsuit, and pursuant to the explicit terms of the Cash Collateral Order, the writs of execution and the levies upon the Property were automatically released.

41.    The Sheriff had conducted his sale of RCM's interest in the Property on May 25, 2015, but the sale was not ratified, because pursuant to the Cash Collateral Order, the writs of execution and corresponding levies against the Property had been released.

42.    On November 12, 2015, the CSA issued its Opinion reversing the circuit court's judgment for tortious interference and for punitive damages, and reversing the circuit court's denial of the motion to release the writs of execution.  The CSA's brief analysis of the issues concerning the writs of execution concluded with the following very obvious legal points:

> During the jury and bench trials in this case, appellees consistently stated – and the circuit court confirmed – that veil-piercing and alter ego claims were not being pursued.  Then, after the judgments were entered against Tenants, appellees filed their request for writs of execution and attempted to transform the proceeding into a direct cause of action against [Congressional LLC and the other property owners].  Even if appellees may have had a valid claim against [Congressional LLC and the other property owners], they are not permitted to proceed in this transformative manner.

12

(*See* Exhibit 6 at 25.)

On December 11, 2015, Tower Oaks filed a motion for reconsideration that addressed certain aspects of the CSA's Opinion. On March 8, 2016, the CSA denied the motion, and on March 9, 2016, it issued its Mandates. (The Mandates in each of the Appeals are attached hereto as **Exhibit 10**.)

### *The Loan and the Notice of Default*

43.     Congressional LLC was originally a limited partnership, but it was converted to a limited liability company in October 2004. A Confirmatory Deed was filed on October 29, 2004, in order to record Congressional LLC as the legal title owner of the Property. (The Confirmatory Deed is attached hereto as **Exhibit 11**.)

44.     Other than the legal conversion of the owner of the Property from a partnership to a limited liability company, there has never been any change in the ownership of the Property since the Property was acquired by Congressional LLC. To be clear, RCM has never had any direct or indirect ownership in the Property, and has never been a direct or indirect owner of an interest in Congressional LLC. (An organizational chart identifying the members of Congressional LLC is attached hereto as **Exhibit 12**.)

45.     RCM was the "Property Manager" of the Property for many years, but that relationship ended as of November 1, 2011, with the knowledge and consent of the Lender. (The Lender's approval is attached hereto as **Exhibit 13**.)

46.     In June 2007, Congressional LLC refinanced the mortgage debt on the Property. The loan for The Shops and the Post Office was $44.5 million, and the loan for the Apartment Parcel was $23.5 million. The two loans were cross collateralized, and the IDOT for each loan was identical other than for items specific to the particular parcel, such as the amount of the loan

and the description of the property.  The Loans were for ten years, with interest at the rate of 6.36% per annum, and required monthly payments of interest only.  The final payment of interest and the principal amount is due on July 1, 2017.

47.    The original lender was Deutsche Bank Mortgage Capital, LLC, but as a result of the securitization of the Loans, the current "Lender" is Wells Fargo, as Trustee for the registered holders of commercial mortgage pass through certificates.

48.    For reasons that are not relevant to this lawsuit, Borrower executed the Promissory Notes for the mortgage loans, and Congressional LLC guaranteed the debt and granted the IDOT for each parcel.

49.    Each IDOT grants the Lender a security interest in all of Congressional LLC's estate, right, title and interest in the "Property," which the IDOTs respectively define as the real property and virtually everything of value connected to the real property, including but not limited to the improvements, easements, equipment, leases, rents, income, accounts receivable, trademarks, tradenames, insurance policies and condemnation awards.

50.    The IDOTs do <u>not</u> grant the Lender a security interest in Congressional LLC itself, or in any member's interest.

51.    Article XII of the IDOTs provides that it is an "Event of Default" if, among other actions, the following occurs:

> 12.1(c) [Congressional LLC] … fails to perform any covenant, agreement, obligation, term or condition set forth in Section <u>3.1</u>, <u>5.3</u> or <u>9.4</u>  (emphasis in original).

> \*          \*          \*

> 12.1(h) **The Property or any part thereof is taken on execution or other process of law <u>in an action against</u> [<u>Congressional LLC</u>]** (emphasis added).

(*See* Exhibit 8 at § 12.1.)

52.   Section 5.3 of the IDOT provides that among other events, the following is an Event of Default:

> (i) **A sale**, conveyance … or other encumbrance or transfer **of the Property or any direct or indirect interest therein**, whether voluntarily or involuntarily … **without [Lender's] prior consent,** … **However, (x) up to** (but not more than) **forty-nine percent (49%) of the** limited partner or **non-managing member interests in [Congressional LLC]** (but not interests in a general partner or managing member) **shall be transferable without [Lender's] consent so long as, after giving effect of such transfer and any prior transfers, no more than forty-nine percent (49%) in the aggregate of such limited partner or non-managing member interests in [Congressional LLC] are owned by any person or entity and their affiliates unless such person or entity and their affiliates** owned more than forty-nine percent (49%) limited partner or non-managing member interest in [Congressional LLC] as of the date hereof, … (emphasis added).

(*See* Exhibit 8 at § 5.3.)

53.   On September 15, 2015, without any prior discussion or contact with Borrower or Congressional LLC, Berkadia sent the Notice of Default via Fedex to Borrower, claiming "that the loan is in default" as a result of Borrower's failure to comply with the terms of the IDOT. The Notice of Default did not provide any information concerning the alleged default other than the following: "In particular, if the Property or any part thereof is taken on execution of other process of law and action [*sic*] against [Congressional LLC] then an Event of Default shall have occurred as defined in Section 12.1(h) of the Mortgage Deed of Trust." The Notice of Default further stated that Berkadia and the Lender were reserving their right "to exercise any and all legal remedies available without further notice or demand." (*See* Exhibit 1.)

54.   Virtually immediately upon the receipt of the Notice of Default, a representative of Congressional LLC, Michael P. Hollander, Esq. ("**Mr. Hollander**") spoke with the person

who had sent the Notice on behalf of Berkadia, Andrew Wood ("**Mr. Wood**").  Mr. Hollander explained what had taken place in the Tower Oaks Lawsuit; that Congressional LLC was not a party to that Lawsuit; and that neither the Property or any part of it had been taken – by execution or otherwise – because RCM did not have any interest in the Property that could be taken and, in any event, the Sheriff's sale had never been ratified.  Thus, as Mr. Hollander explained, there had been no Event of Default because (i) there was no action filed against Congressional LLC, and (ii) none of the Property had been "taken on execution or other process of law," as required by Section 12(h) of the IDOTs.  The conversation concluded by Mr. Hollander promising to provide Berkadia with documentation to demonstrate the facts he had related.

    55.    On September 21, 2015, Mr. Hollander sent Mr. Wood a written response to the Notice of Default.  The letter thoroughly explained what had taken place in the Tower Oaks Lawsuit, and what actions had been taken with respect to the writs of execution.  The letter included copies of (i) the "Schedule of Attached Property" filed by the Sheriff, which reported that, on July 8, 2014, by virtue of the writs of execution, the Sheriff seized only whatever interest RCM had in the Property; (ii) the Cash Collateral Order, which granted RCM the right to post cash with the clerk of the court as a bond for the judgment, and which specified "that upon posting of the … cash deposit …, the Writs of Execution and corresponding levies issued against [the property] are HEREBY RELEASED …"; (iii) a receipt from the clerk of the court for RCM's cash deposit of $12 million posted on June 17, 2015; and (iv) an organizational chart for Congressional LLC that identified all of its members, which showed that RCM did not hold a direct or indirect ownership interest in Congressional LLC.  (*See* Exhibit 2.)

56.    Berkadia did not respond to the information and documentation demonstrating that there had not been an Event of Default.  Instead, the responsibility for servicing the Loans was transferred from Berkadia to Situs.  Upon information and belief, as a "special servicer," Situs is compensated by receiving a servicing fee and a percentage of the default interest it collects, which may far exceed the servicing fee.  Indeed, some special servicing agreements are reputed to provide for as much as 50% of the default interest collected as compensation for the special servicer.

57.    In a letter dated September 29, 2015, Jimmy Yoo, an "Asset Manager" with Situs, informed the Borrower that KeyBank National Association had been designated as the "Master Servicer" and that Situs had been designated as the "Special Servicer" of the Loans on behalf of the Lender.  The letter further informed Borrower that mortgage payments should continue to be made to Berkadia, but that all future communications were to be directed to Situs.  However, "[p]rior to commencing any substantive discussions, the enclosed Pre-Negotiation Agreement must be executed by the Borrower and returned to the undersigned **without changes**" (underlining and boldface in original).  (Mr. Yoo's letter is attached hereto as **Exhibit 14**.)

58.    The Pre-Negotiation Agreement was three and one half pages, single spaced, and contained detailed and complex provisions intended to protect Situs and the Lender with respect to any discussions concerning the Notice of Default, including by providing that "[a]ll discussions which have been conducted heretofore between any of them with reference to the Loan or this Agreement and which will be conducted hereafter with respect to the Loan are and shall be considered settlement discussions and negotiations with reference to real and bonafide disputes and controversies which presently exist between or among the Lender and Borrower,

Borrower principal and Guarantor." (*See* Exhibit 13.)  The Borrower did not execute the Pre-Negotiation Agreement because, among other reasons, there was no bonafide dispute.

59.    In a letter to plaintiffs dated November 18, 2015, counsel for Situs, Robert Stupar ("**Mr. Stupar**"), reported that he was in receipt of information with respect to the Tower Oaks Lawsuit ("**Stupar's Letter**").    Stupar's Letter erroneously described RCM as "the property manager for the Property."  (Stupar's Letter is attached hereto as Exhibit 7.)  In fact, in 2011, Plaintiffs had requested that KeyBank, which was then the regular servicer of the Loans, approve Congressional LLC's decision to replace RCM as the manager of the Property and KeyBank did so on behalf of the Lender.  (*See* Exhibit 12.)

60.    Stupar's Letter also stated that as a result of the Tower Oaks Lawsuit, "on May 28, 2015, the Sheriff … sold `All the right and title, claim, interest, and estate, at the time the judgment became a lien on the property, both at law and in equity of the said [RCM], of, in, to, and about the [Property].'"  Stupar's Letter quoted Section 5.3(a) of the IDOT concerning an Event of Default occurring if there is a sale or transfer of an interest in the Property, and noting that Section 5.3 did not require "that the interest sold must be the interest of the Owner." Stupar's Letter also referenced Section 12.1 of the Deed of Trust, wherein it states that an Event of Default would include an unauthorized transfer under Section 5.3(a) of the IDOT.  The letter continued by stating, "Accordingly, and as you were notified by the Default Notice, [Lender] hereby confirms that an Event of Default has occurred under the Loan Documents as a result of said Transfer." (*See* Exhibit 7.)

61.    Stupar's Letter did <u>not</u> acknowledge the facts that the Sheriff's sale had not been ratified, or that the writs had been released by virtue of the $12 million cash deposit with the clerk of the court. The Letter did acknowledge the CSA's opinion, but bizarrely characterized it

as "purporting" to reverse the circuit court's denial of Congressional LLC's motion to release the property from the Sheriff's levy. Stupar's Letter concluded by requesting Plaintiffs to "immediately provide written proof that the [Sheriff's sale] has been annulled," as if the clear and express holding of the CSA was insufficient for that purpose. (*See* Exhibit 7, and Exhibit 6 at 25.)

62.    The day after Stupar's Letter was received, on November 19, 2015, Mr. Hollander sent an email in response that refuted the contention that there had been an Event of Default. He pointed out that Plaintiffs had "painstakingly documented to Mr. Stupar" that RCM had no direct or indirect interest in the Property or in Congressional LLC, the owner of the Property; and that the only relationship that RCM had with the Property or the owner was that RCM had been the property manager until November 2011. Mr. Hollander also explained that Mr. Stupar's reliance upon Section 5.3(a) of the IDOT was invalid in any event, because even if RCM had some "direct or indirect" interest in the Property, that interest certainly could not under any scenario exceed the level of forty-nine percent (49%) of the non-managing member interests, which is required under Section 5.3(a) for an Event of Default to occur. Mr. Hollander further pointed out, yet again, (i) that the Cash Collateral Order was provided to Berkadia on September 21, 2015, and it directed that once the cash deposit was posted, the writs of execution were automatically released; (ii) that the Sheriff's sale was never ratified, so there had not been a "transfer" of any interest in the Property supposedly held by RCM; and (iii) since the underlying writs of execution were vacated by the CSA, the Sheriff's sale could never be ratified. (Mr. Hollander's email is attached hereto as **Exhibit 15**.)

63.    Mr. Stupar responded by email on November 23, 2015, the same day to Mr. Hollander's November 19th email, but completely ignored the facts set forth by Mr. Hollander

and did not offer <u>any</u> analysis or support for the Defendants' continuing to contend that a default

had occurred.  (Mr. Stupar's email is attached hereto in **Exhibit 15**.)

64.    On November 24, 2015, another representative of the plaintiffs, Eric Siegel ("**Mr.**

**Siegel**"), sent an email to Mr. Stupar succinctly reiterating, again, the indisputable facts

demonstrating that there been no Event of Default:

> Our litigation counsel Glenn Etelson reached out to you to answer any
> questions you may have regarding the attempted sheriff's sale in the
> Tower Oaks litigation.  Mr. Etelson has opined, based on the Court of
> Special Appeals decision reversal of the circuit court's order denying the
> property owners' motion to release the levies and the cash collateral order
> which expressly states that the writs of execution were vacated upon the
> posting of the cash collateral, that the appellate opinion is dispositive of
> your question regarding the validity of the attempted sheriff's sale.  In
> short, the sale is nullified by the appellate decision and the posting of cash
> collateral.  The sale was never ratified by the circuit court and does not
> become a valid sale until such ratification takes place.  Since the circuit
> court was reversed, no such ratification has taken place and can no longer
> take place. … If you wish to discuss the matter further with Glenn, please
> feel free to call him …

(Mr. Siegel's email is attached here to as **Exhibit 16**.)

65.    Mr. Stupar did not make any response, let alone a substantive one, to Mr. Siegel's

email.

66.    On December 9, 2015, Mr. Hollander sent an email to Mr. Stupar that read, in

pertinent part, as follows:

> I believe that we have fully documented and adequately rebutted all claims
> of default as embodied in Berkadia's September 15, 2015 letters and yours
> of November 18, 2015.  There simply has been no event of default under
> these loans.  Isn't it time that the Lender simply acknowledge its error,
> retract its claims of default and allow us to move on without wasting any
> more time on this matter?

Mr. Stupar responded the same day by assuring Mr. Hollander that "[w]e will check in with you once we have completed our analysis." (Mr. Hollander's email is attached hereto as **Exhibit 17**.)

67.     On January 8, 2016, having heard nothing further from Mr. Stupar, Mr. Hollander sent an email to Mr. Stupar asking, "[a]ny movement on this matter?" Rather than make a substantive response, Mr. Stupar simply stated that he had been hoping to hear whether the CSA had issued its mandate or ruled on Tower Oaks' motion to reconsider the CSA's opinion. (The email exchange is attached hereto as **Exhibit 18**.)

68.     As of the filing of this Complaint, the Defendants continue to maintain that the Loans are in default and that the Plaintiffs are liable for default interest and other costs and penalties associated with a default pursuant to the terms of the IDOTs. Yet, the Defendants still have not provided any substitutive response to the clear and determinative points made by the Plaintiffs demonstrating that there has been no default.

69.     The Plaintiffs have never defaulted on any payment due under the Loans and at all times the Loans have been fully performing. Yet, the Plaintiffs are living under the constant threat of being assessed default interest and other expenses, and of other actions that Defendants could potentially attempt to enforce their claim of a default.

## COUNT I
### (*Declaratory Judgment*)

70.     Plaintiffs repeat, reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

71.     Pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs seek a declaration by this Court of its rights under the IDOTs securing the Property.

72.    The Notice of Default issued by Berkadia claims that there was a default under Section 12.1(h) of the IDOTs.  More than two months after Berkadia issued the Notice of Default, Situs, the Special Servicer, contended that there was a default pursuant to Section 5.3(a) of the IDOTs.  In fact, there was no default under either Section 12.1(h) or Section 5.3(a) of the IDOTs.

73.    RCM has never had an ownership interest in the Property.  The circuit court's decision not to grant the Plaintiffs' motion to release the writs of execution levied upon the Property was reversed by the CSA, which found that there was no legal basis for the circuit court to have allowed the writs to have been pursued.  Further, although the Sheriff conducted a sale of whatever interest RCM had in the Property (RCM clearly had none), that sale was never ratified, as the $12 million cash deposit by RCM caused the writs to be automatically released pursuant to the Cash Collateral Order.  Thus, even if it is assumed that RCM theoretically had an interest in the Property, that interest was never transferred.

74.    Under Maryland Rule 2-641, the clerk of the court where a judgment was recorded, is required to issue a writ of execution upon the written request of a judgment creditor, and such a writ is to be served along with a notice that advises the property owner, *inter alia*, that there is a right to move for release of the property from the levy.  Clearly the service of a writ of execution upon a property cannot be sufficient to cause a default, because the property owner would thereby be at the mercy of any third party who wished to attempt to encumber the property.  In the present case, the Defendants are attempting to impose a default upon the Plaintiffs because a third party improperly placed levies on the Property that were later deemed to be illegally imposed.

75.    The Notice of Default contended that there was a default under Section 12.1(h) of the IDOTs because the Property purportedly had been "taken on execution or other process of law in an action against [Congressional LLC]" (emphasis added).    However, it is indisputable that the writs of execution were not generated from an action brought against Congressional LLC, and that the Property was not taken to any extent whatsoever, because RCM had no interest in the Property.  In addition, the CSA's opinion establishes as a matter of law that the writs of execution had been improperly served on the Property.

76.    More than two months after the Notice of Default had been served upon the Plaintiffs, Situs contended that the Event of Default was a violation of Section 5.3 of the IDOTs, but that section provides that an encumbrance or transfer of the Property without the Lender's prior consent is an Event of Default only if it results in more than forty-nine percent (49%) of the membership interests in Congressional LLC being transferred.  There is no conceivable scenario under which the writs of execution could have, and it is an indisputable fact that they did not, result in the transfer of any interest, let alone more than forty-nine percent (49%) of the membership interests in Congressional LLC.

77.    Plaintiffs are entitled to a declaration that none of the actions taken by the Sheriff – neither the service of the writs of execution or the purported sale of RCM's non-existent interest in the Property – resulted in an Event of Default under either Section 5.3(a) or Section 12.1(h) of the IDOTs; that the Notice of Default should not have been issued; and that the servicing of the Loans should not have been transferred to a Special Servicer.

WHEREFORE, Plaintiffs demand judgment as follows:

a.    Pursuant to 28 U.S.C.A. §2201 and Federal Rules of Civil Procedure 57, that this Court declare that the writs of execution requested by Tower Oaks and the actions of the

Sheriff with regard to those writs did not at any time constitute an Event of Default; that the Notice of Default was issued without sufficient grounds; and that the transfer of the servicing of the Loans to a special servicer was unwarranted.

> b.    Such other and further relief as the Court may deem just and proper.

## COUNT II
### (*Breach of Contract*)

78.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

79.    With the authority granted to them by KeyBank and Wells Fargo, Berkadia and Situs breached the IDOTs, first by declaring an Event of Default and then by continuing to contend that there had been an Event of Default when the undisputed facts and ruling of the CSA proved otherwise.

80.    The Notice of Default and the Defendants continuing to contend that an Event of Default occurred were and are continuing breaches of the provisions of the IDOTs that specify the grounds for declaring a default.

81.    The Plaintiffs have been damaged in an amount in excess of $100,000.00 by their inability to defease the Loans while the Notice of Default and Special Servicing are in place, and will be damaged further by being unable to refinance the Loans at market rates because the Notice of Default and Special Servicing cause potential lenders to require higher than market rates for any refinancing of property under such circumstances.

WHEREFORE, Plaintiffs demand judgment as follows:

> a.    That this Court enter judgment in favor of the Plaintiffs and against the Defendant, jointly and severally, for an amount in excess of $100,000.00, with the exact amount to be determined at trial.

b.    Such other and further relief as the Court may deem just and proper.

**VERIFICATION**

I, Michael Hollander, declare under the penalty of perjury that I have reviewed this Verified Complaint for Declaratory Judgment and Breach of Contract, and either have personal knowledge of the factual allegations set forth herein, or believe them to be true based on the exhibits and other information available to me.

_____
Michael Hollander, Esquire

Respectfully submitted,

_____/s/_____
PRICE O. GIELEN
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street, 27th Floor
Baltimore, MD 21202
(410) 332-8523

*Attorneys for Plaintiffs*

367897.13 / 3084.17